(3 App. Div. 118.)

### GENERAL ELECTRIC CO. v. WIGHTMAN.

(Supreme Court, Appellate Division, Fourth Department. March, 1896.)

1. CORPORATIONS—AGREEMENT TO SUBSCRIBE TO STOCK.
   A contract to subscribe for shares of stock of a corporation which have not been issued violates the policy of Laws 1890, c. 564 (Stock Corporation Law), §§ 41, 42 (which require subscribers to pay, at the time of subscribing, 10 per cent. of the amount subscribed in money, unless the stock is issued for labor done or property. actually received for the use of the corporation), and is therefore void.

2. MORTGAGES—FORECLOSURE—CHOSES IN ACTION.
   A sale of choses in action under foreclosure of a mortgage passes no title unless they are described in the judgment, notice of sale, and conveyance with sufficient particularity to be identified.

Appeal from circuit court, Erie county.

Action by the General Electric Company against George B. Wightman on a contract to subscribe to the stock of the Buffalo, North Main Street & Tonawanda Electric Railroad Company. Said railroad company executed a mortgage to plaintiff for $44,000, covering all its property, including "things in action, contracts, claims, and demands of the said railroad company." Afterwards the mortgage was foreclosed, and the mortgaged property was pur-

chased by James C. Carr, to whom the referee gave a deed, and who afterwards assigned to plaintiff the choses in action required under the foreclosure.   The complaint was dismissed, and plaintiff appeals.

The contract sued on is as follows:

"Buffalo, North Main Street and Tonawanda Electric Railroad Company.

"Whereas, the above-named company was duly incorporated under the general railroad laws of the state of New York, on the 26th day of March, 1892, having the following officers: President, L. F. W. Arend; vice president, Albert T. Fancher; secretary, Edward Rutherford; and treasurer, Charles C. Mead.   The capital stock of the company is $60,000, divided into 600 shares, of $100 each.   And whereas, it is proposed by this company to build and operate an electric street railroad on the following route:   Beginning on Main street, in the city of Buffalo, N. Y., near its intersection with the city line, and running thence northwesterly, through private property, to the intersection of the Town Line Road, so called, with the city line of said city of Buffalo; running thence northerly, along and on the east side of the Town Line Road, to Mischler's Corners; running thence northwesterly, along the Eggertsville Road or Williamsville Road, so called, to the village of Tonawanda, N. Y.; and northerly along Young street, which is a continuation of the Williamsville Road, of said village, to within 100 feet of the intersection of Young street with Main street, of said village. The road is to be operated as soon as completed, and cars will make half-hourly trips each way:   Now, therefore, we, the undersigned, for and in consideration of the foregoing promises and the fulfillment thereof, hereby agree with the said Buffalo, North Main Street and Tonawanda Electric Railroad Company to subscribe for the number of shares of stock in said railroad company set opposite our respective names below, at the time when and as soon as the roadbed of said proposed railroad, on the route above specified, shall have been graded, and ties and rails shall have been laid thereon; and we further agree to pay one-half of such stock in cash at the time of such subscription, and the other half thereof in cash when the said railroad shall have been in operation fifteen days.

| Names. | P. O. Addresses. | No. of Shares. |
| --- | --- | --- |
| Wm. Coulson. | Buffalo, | Ten. |
| Andrew J. Kurtz. | Buffalo. | Ten. |
| F. S. Oaks. | Cattaraugus, N. Y. | Two. |
| Geo. B. Wightman. | Buffalo. | Two. |
| Albert C. Spann. | Buffalo. | Three. |
| Maria C. Sickman. | Buffalo. | 2½ shares, $250." |

Argued before HARDIN, P. J., and FOLLETT, ADAMS, WARD, and GREEN, JJ.

Clark H. Timerman, for appellant.
Thomas R. Stone, for respondent.

FOLLETT, J.   This action was begun February 3, 1894, to recover damages alleged to be $200, with interest from May 1, 1893, for the defendant's failure to subscribe and pay for two shares of the capital stock of the Buffalo, North Main Street & Tonawanda Electric Railroad Company, as provided in the contract set forth in the statement of facts.   The defendant, in his answer, alleged that the contract was invalid, was procured by fraud and false representations, and that the railroad company had failed to perform the conditions contained in the contract, and certain collateral conditions and stipulations made when the contract was signed.   At the close of the plaintiff's evidence, the complaint

was dismissed, and the plaintiff excepted. The dismissal of the complaint was rested on two grounds: (1) That the contract was invalid; (2) that the plaintiff acquired no title to the contract through the mortgage and its foreclosure.

The defendant never subscribed for any shares, and never paid any sum on account of his contract to subscribe in the future for two shares. Whether the subscription contract was signed before or after May 18, 1892 (the date of the amendment of the stock corporation law), is not disclosed by the evidence, though it is alleged in the complaint that it was executed on or about May 15, 1892.

By the stock corporation law (Laws 1890, c. 564; Gen. Laws, c. 38) it was provided:

"Sec. 41. Subscriptions to Stock. If the whole capital stock shall not have been subscribed at the time of filing the certificate of incorporation, the directors named in the certificate, may open books of subscription to fill up the capital stock in such places and after giving such notices as they may deem expedient, and may continue to receive subscriptions until the whole capital stock is subscribed. At the time of subscribing every subscriber shall pay to the directors ten per cent. upon the amount subscribed by him in money, and no subscription shall be received or taken without such payment, except as provided in the next section.

"Sec. 42. Must be Paid for in Cash—Exceptions. No corporation shall issue either stock or bonds except for money, labor done or property actually received for the use and lawful purposes of such corporation, at its fair value, and all stock issued in violation of the provisions of this section shall be void."

By chapter 688, Laws 1892 (chapter 36, Gen. Laws), passed May 18, 1892, the above sections were amended; so they now read as follows:

"Sec. 41. Subscriptions to Stock. If the whole capital stock shall not have been subscribed at the time of filing the certificate of incorporation, the directors named in the certificate may open books of subscription to fill up the capital stock in such places, and after giving such notices as they may deem expedient, and may continue to receive subscriptions until the whole capital stock is subscribed. At the time of subscribing every subscriber, whose subscription is payable in money, shall pay to the directors ten per centum upon the amount subscribed by him in cash, and no such subscription shall be received or taken without such payment.

"Sec. 42. Consideration for Issue of Stock and Bonds. No corporation shall issue either stock or bonds except for money, labor done or property actually received for the use and lawful purposes of such corporation. No such stock shall be issued for less than its par value. No such bonds shall be issued for less than the fair market value thereof."

In this state, corporations can be organized only pursuant to special charters or to general statutes authorizing their organization for certain prescribed purposes. The General Statutes require stock corporations to have a capital the amount of which, and the par value of the shares, are to be fixed by the certificates of incorporation. These statutes prescribe how shares of stock shall be subscribed, paid for, and issued; and it is the policy of this state to require all corporations to be organized honestly, with a bona fide capital stock, to be issued only for cash, labor, or property, and thus provide the necessary means for carrying out the purposes of their creation, and thereby prevent frauds upon their creditors and the public. The statutes provide that the affairs of the cor-

poration shall be controlled by the shareholders, and by directors elected by shareholders, and thus provide for their management by persons having a pecuniary interest in their success.    In this state, contracts by which individuals agree to become shareholders in corporations are not governed by the rules applicable to common-law contracts, but are controlled by the statutes prescribing how such contracts shall be made.

The learned counsel for the plaintiff insists that corporations may provide for securing their capital by contracts to subscribe in the future for shares, instead of by subscriptions made in the mode prescribed by statute.    This contention, I think, is not founded on reason or precedent; and, if sanctioned, would open the door for promoters to create broods of corporations without substantial capital, which, instead of being controlled by shareholders having a pecuniary interest in their success, would be wholly within the control of the original incorporators.    The case before us is a forcible illustration of the evils which would flow from permitting corporations to make and enforce such contracts.    The capital stock of this corporation was fixed at $60,000, which, had it been subscribed, paid in, and honestly expended, would have insured the construction of the road; but, instead of raising or attempting to raise the capital required, 15 persons, the precise number required by the statute, executed a certificate of incorporation, and subscribed for 10 per cent. of the capital stock, and paid in 10 per cent. ($600) on their subscriptions.    Whether other subscriptions for stock made in the manner required by the statute were secured does not appear, though it was shown that $8,463.12, in addition to the $600, was paid in by shareholders, which equals 15 per cent. plus $63.12 of the capital stock of the corporation.    The property of the corporation was then mortgaged for $44,000, and the result was speedy bankruptcy,—the usual one with corporations so organized.

Persons entering into contracts like the one under consideration do not become shareholders until their shares are paid for and issued, until which time they are entitled to no voice in the management of the affairs of the corporation, which will be wholly under control of the original incorporators, who may, as in this case, content themselves with subscribing for barely sufficient capital to effect an organization of a corporation to be controlled and managed in their interests.    It has been held in this state that conditional subscriptions for the stock of corporations are contrary to public policy, and void.    Turnpike Co. v. North, 1 Hill, 518; Plank-Road Co. v. Payne, 15 N. Y. 583.    The contract before us is not only a conditional one, but it provides for securing the capital stock of the corporation in a way not authorized by statute.    It should be borne in mind that the contract under consideration does not relate to the purchase of shares legally issued by the corporation to some shareholder, and subsequently acquired by the corporation, but it is a contract in respect to shares which had not been issued, and had no independent existence, and was an attempt to secure the original capital stock in a mode not sanctioned by the statute.    If this contract is valid, a corporation may enter into contracts indefi-

nitely postponing the time for the purchase of and payment for shares, make the payment therefor dependent upon such conditions as the parties may agree upon, and thus defeat the theory of our statutes that the stock of corporations shall be promptly subscribed and paid for by shareholders, all standing on the same footing, to the end that the corporation shall have a sufficient capital, and be controlled by persons having a pecuniary interest in its success. This contract violates the policy of this state in respect to the mode of making up the capital of corporations, and should not be enforced.

Again, the plaintiff is attempting to enforce this contract in aid of the mortgage which it took December 10, 1892, for $44,000, in defiance of the second section of chapter 688 of the Laws of 1892 (Stock Corporation Law), which provides:

"The amount of the obligations issued and outstanding at any one time secured by such mortgages, excepting mortgages given as a consideration for the purchase of real estate, and mortgages authorized by contracts made prior to May 1st, 1891, shall not exceed the amount of its paid up capital stock, or an amount equal to two-thirds of the value of its corporate property at the time of issuing the obligations secured by such mortgages, in case such two-thirds value shall be more than the amount of such paid up capital stock."

The case shows that the amount for which this mortgage was given greatly exceeded the amount of the paid-up capital stock of the corporation, and it inferentially appears from the record that the mortgage was given to secure a sum exceeding two-thirds of the value of the property of the corporation.

By the record in Dean v. Biggs, 25 Hun, 122, affirmed, 93 N. Y. 662, it appears that the defendant executed the certificate of incorporation by which he subscribed for five shares, paying 25 per cent., and thus became one of the original incorporators of the railroad, which subsequently mortgaged its railway, real estate, certain chattels, "and all the chartered rights, privileges, and franchises now possessed, or which shall hereafter be acquired, by the party of the first part, pertaining to said railroad, as completed, and to be completed, together with all and singular the tenements, hereditaments, and appurtenances thereunto belonging, or in any wise appertaining, and the reversions, remainders, tolls, incomes, rents, issues, and profits thereof, and also all the estate, rights, title, interest, property, possession, claim, and demand whatsoever, as well in law as in equity, of the said party of the first part, of, in, and to the same, and every part thereof, with the appurtenances." June 3, 1876, pursuant to a judgment of foreclosure, the property mortgaged was sold, and conveyed to Merritt King, by a conveyance which followed the description contained in the mortgage; and thereafter he assigned his title to the stock subscriptions to Dean, the plaintiff in the action. After the foreclosure sale, a judgment was recovered by a creditor of the corporation, sequestrating its property, and appointing a receiver therefor, who afterwards assumed to sell the claims arising upon the subscriptions for stock. At the receiver's sale, the defendant became the purchaser of his own subscription; and the question was: Which had the better title, the purchaser under foreclosure, or the purchaser under the receiver?

Dean sought to sustain his action upon two grounds: (1) That subscriptions were covered by the words "property, possession, claim, and demand whatsoever, as well in law as in equity, of the said party of the first part"; (2) that, the subscription having been made by an incorporator for the purpose of organizing the corporation, it was an incident of the franchise, and passed under the mortgage. It was held that the mortgage was not a lien upon the subscription, and that the purchaser under the foreclosure acquired no title to it.

Assuming that, under the statutes of this state, a railroad may mortgage its choses in action, and by general words, I think the purchaser under the foreclosure of such a mortgage acquires no title to choses in action which are not described in the judgment notice of sale, and in the conveyance, with sufficient particularity to be identified. Dean v. Biggs, supra; Milwaukee & M. R. Co. v. Milwaukee & W. R. Co., 20 Wis. 174; Smith v. McCullough, 104 U. S. 25; Morgan Co. v. Thomas, 76 Ill. 120; 5 Thomp. Corp. § 6197; Jones, Ry. Secur. § 108; 3 Wood, Ry. Law (1st Ed.) 1617. To hold that choses in action pass under general words, in judgments and conveyances, would cause confusion and uncertainty in respect to the property which the purchasers under foreclosure sales acquire. Judicial sales must describe with reasonable certainty the property sold. The judgment should be affirmed, with costs.

Judgment affirmed, with costs. All concur.